J-A14029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| PATRICIA LYNNE RORRER | |
| Appellant | No. 1919 EDA 2016 |

Appeal from the PCRA Order May 26, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0002176-1997

BEFORE:  BENDER, P.J.E., BOWES AND SHOGAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 26, 2017**

Patricia Lynne Rorrer appeals the PCRA court's dismissal of her fourth PCRA petition as untimely filed.  We affirm.

This matter involves the 1994 murders of Joann Katrinak and her infant son Alex.  The evidence presented against Appellant at her February 1998 jury trial revealed the following.  Joann's husband Andrew Katrinak and Appellant had been romantically involved. That aspect of their relationship ended in May 1993, but they continued to remain in regular contact thereafter.  On December 12, 1994, Appellant telephoned the Katrinak residence to speak with Andrew, and Joann, using profane language, told Appellant never to call again, that she and Andrew were happily married with a baby, and that Appellant was to leave Andrew alone.

On December 15, 1994, Joann planned to go on a shopping trip with her baby and her mother-in-law, but Joann and Alex never arrived. Andrew immediately contacted police and informed them of her disappearance. Police initially were unconcerned, but Andrew and his relatives were alarmed and began to search for her. Joann's empty car was discovered 100 yards from her residence in the parking lot of a tavern. When police suggested that Andrew move the vehicle, he refused since he feared that his wife and child might be the victims of foul play and believed that the vehicle might contain evidence.

After Joann's vehicle was found, police went to the Katrinak residence. There were signs of forced entry, and a telephone line was cut in the basement. Evidence was taken from Joann's undisturbed vehicle. Ten hairs were recovered from the back of the driver's seat headrest. Police initially suspected Andrew was involved in the disappearance but cleared him after investigation.

On April 9, 1995, a farmer discovered the bodies of Joann and Alex in a wooded area in Heidelberg Township. Joann had been beaten and shot in the face with a .22 caliber handgun, and the baby either was suffocated or died of exposure. A cigarette butt was recovered at the scene. Since Joann and Alex were found along a path that Appellant used to ride horses, Appellant became a suspect in their murders.

Sandra and Stephan Ireland testified that Appellant's mother appeared unexpectedly at their home shortly after the victims' bodies were found. Appellant's mother showed them a small handgun, said that she did not want police to find it, and asked the Irelands to keep it. They declined to aid Appellant's mother in hiding the gun from police.

After the bodies were found, the ten hairs found on the back of the headrest of Joann's abandoned car became a focus of police investigation. Six of the ten hairs recovered from the back of the driver's seat headrest did not match any of the Katrinak family's hairs. We will refer to these six hairs of unknown source and found on the back of the driver's seat headrest of Joann's abandoned car as the "seatback hairs." The seatback hairs were submitted to the Pennsylvania State Police Crime Laboratory, where criminalist Thomas Jensen divided the collection into two groups of three hairs. Three seatback hairs that had roots were mounted on individual microscope slides, and the slides were sent to the Federal Bureau of Investigation ("FBI") for mitochondrial DNA testing on July 11, 1995. The other three hairs remained unmounted and were sent to the FBI laboratory later.

Appellant's home was searched late in the summer of 1995, and she refused to provide hair samples. On November 8, 1995, police, armed with a warrant, obtained exemplar hairs from Appellant's head to test them against the six seatback hairs. N.T. Pretrial Hearing, 11/19/97, at 29-30.

- 3 -

Mitochondrial DNA testing conducted on the hairs in the slides and the exemplar hairs taken from Appellant established that Appellant was an indicated source of the three seatback hairs sent to the FBI on slides.

Suzanne Pearson of the Davidson County Sheriff's Office, Lexington, North Carolina, was present at Appellant's June 24, 1997 arrest. Sheriff Pearson was not involved in taking Appellant into custody, but was present pursuant to her department's policy to have a female officer at an interdiction that involved the arrest of a female. Sheriff Pearson testified that, when law enforcement officials arrived to arrest Appellant, Appellant was crying and rocking her baby daughter, Nicole, who also was crying. Appellant started speaking to the child and told her that she was sorry. Then, Appellant said, "[W]hy did I do this, Nicole. If I had known I would get caught, I would have never brought you into this world." N.T. Trial, 2/17/98, at 284. Appellant next told her daughter that she did not kill Alex because she would never harm a child. As she was being led from her home, Appellant blurted out, "I'm never going to see my baby again[.] I'm going to the electric chair." *Id*. at 290. These were Appellant's exact words; Sheriff Pearson was taking notes as Appellant uttered them. *Id*. at 284, 288.

On March 9, 1998, a jury found Appellant guilty of two counts each of first-degree murder and kidnapping, and the trial court immediately imposed a life sentence followed by a consecutive term of ten to twenty years

imprisonment. Appellant filed a post-sentence motion, raising 105 claims of ineffectiveness of trial counsel and numerous allegations of trial court error. The trial court held hearings and denied the motions. It authored an extensive opinion addressing all of Appellant's issues. On direct appeal, Appellant presented four ineffectiveness claims, which we rejected. **Commonwealth v. Rorrer**, 748 A.2d 776 (Pa.Super. 1999) (unpublished memorandum), *appeal denied*, 757 A.2d 931 (Pa. 2000).

Appellant filed a timely PCRA petition, which was denied. On appeal, Appellant averred that direct appeal counsel was ineffective for not pursuing all 105 claims of trial counsel's ineffectiveness that had been litigated in the post-trial setting. We rejected that argument and affirmed the denial of PCRA relief. **Commonwealth v. Rorrer**, 844 A.2d 1288 (Pa.Super. 2003) (unpublished memorandum).

On June 27, 2005, Appellant filed a petition under 42 Pa.C.S. § 9543.1, which was enacted in 2002 and implemented procedures for a person convicted of a criminal offense and serving a jail term to obtain forensic DNA testing on specific evidence. Pursuant to that petition, Appellant successfully obtained post-conviction DNA testing of the six seatback hairs, a fingernail fragment discovered on the victim's body, and the cigarette butt recovered near the victims' bodies. The district attorney represented to the DNA court that the three seatback hairs that were mounted on the slides belonged to the murderer.

Appellant's counsel agreed that those three seatback hairs belonged to the killer, stating that the "mounted hairs that Tom Jensen originally mounted are the killer's and they solve the crime because they are the killer's hairs and they have Joann Katrinak's blood on them." N.T. Hearing, 12/1/06, at 60. Appellant's counsel then acknowledged that there was no question regarding the chain of custody of those three hairs. Specifically, Appellant's counsel said, "[T]he fact is the originally mounted hairs are not tainted by what we believe is a questionable chain of custody. Those three were mounted right after they were found, days after this woman and her baby disappeared. There is no question of chain of custody[.]" *Id*. Appellant's counsel claimed that nuclear DNA testing, which is a more advanced form of testing than mitochondrial DNA testing, would exonerate Appellant.

The Commonwealth thereafter agreed to allow nuclear DNA testing of the fingernail fragment, all six seatback hairs, and the cigarette butt found near the bodies. The items in question were sent to Appellant's selected laboratory, Orchid Cellmark Laboratories of Dallas, Texas ("Orchid"). Orchid was able to collect DNA evidence from all six seatback hairs and the cigarette butt, conducted nuclear DNA testing, and concluded that all six seatback hairs belonged to Appellant. Additionally, DNA on the cigarette butt found near the two bodies belonged to Appellant. Orchid was unable to recover material that could be tested from the fingernail. The court

thereafter denied Appellant's request for further testing of the fingernail and rejected Appellant's post-test proposition that there was not a valid chain of custody with respect to the six seatback hairs sent to Orchid. Appellant suggested that Pennsylvania State Police accidentally switched her exemplar hairs for the three seatback hairs when the police mounted the hairs in question and that her exemplar hairs were sent to the FBI and later to Orchid. The DNA court rejected that proposition.

On July 24, 2006, while the § 9543.1 petition was still being litigated, Appellant filed a second petition for PCRA relief, claiming that the Commonwealth intentionally withheld exculpatory evidence consisting of a statement that Walter Traupman gave to police. The PCRA court permitted Mr. Traupman to be deposed because his statement was not available.

The record contains a report authored by the investigating officer in this case, Pennsylvania State Trooper Robert V. Egan, III, detailing his interactions with Mr. Traupman.[1] That report explained why statements Mr. Traupman made to police were unavailable. Trooper Egan reported the following. Mr. Traupman appeared at the police station about fifteen times after the bodies of Joann and Alex were discovered. State Police took a

---

[1] Trooper Egan mistakenly believed that the man's last name was Troutman, which he utilized in his report.

statement from Mr. Traupman when he came to the station on the first occasion.

At that time, Mr. Traupman told police that, at 1:00 p.m. on December 15, 1994, he saw a Hispanic male having an argument with Joann while she was seated in her car on a public street and that the male was pounding on the car window. The second time that Mr. Traupman arrived at the police station, he represented that he saw Joann's husband, Andrew, on the news and that the Hispanic male arguing with Joann was Andrew wearing a mustache and wig.

Mr. Traupman continued to appear at the police station "changing versions of what he saw" at 1:00 p.m. on December 15, 1994. PCRA Petition, 9/24/15, at Exhibit 10. On October 31, 1995, Mr. Traupman came to the station, and he yelled at Trooper Eagan, "I'm starting to get fed up with you." *Id*. After the man "continued to scream and display disruptive behavior," Officer Egan "escorted him outside the building." *Id*. Police discarded Mr. Traupman's statements based upon their conclusion that they had no investigative value.

At his deposition, Mr. Traupman claimed that he witnessed a fight between the victim and her husband on a public street on December 15, 1994, and that, when he went to the police barracks to tell them about this observation, a police officer pushed him out of the door, "shoved [him] down the steps," and injured his neck. N.T. Deposition, 7/27/06, at 9.

On June 25, 2009, the court denied the July 24, 2006 PCRA petition, concluding that Mr. Traupman's deposition did not warrant the grant of a new trial in light of the DNA evidence against Appellant. At that time, the PCRA court did not have the benefit of Officer Egan's report, which discredited Mr. Traupman as a witness. Appellant did not appeal from the PCRA court's denial of her 2006 PCRA petition.

Appellant filed her third PCRA petition on August 24, 2012. She revisited her entitlement to DNA testing of the fingernail fragment, maintaining that she had just discovered that the Commonwealth had tampered with it. Appellant, who was thirty-three years old when she committed the murders, also asserted that she should be accorded relief from her sentence of life imprisonment without parole under **Miller v. Alabama**, 132 S.Ct. 2455 (2012), which held that the eighth amendment prohibits the sentencing of a juvenile homicide offender to a mandatory term of life imprisonment without parole. Relief was denied, and, on appeal, we affirmed.[2] **Commonwealth v. Rorrer**, 93 A.3d 508 (Pa.Super. 2013), *appeal denied*, 92 A.3d 811 (Pa. 2014). We specifically articulated in that decision that Appellant's judgment of sentence became final for purposes of

_____

[2] Therein, we characterized that PCRA petition as Appellant's fourth one. However, since Appellant's second petition for post-conviction relief sought DNA testing under § 9543.1, it has not been treated as a PCRA petition by the parties or the PCRA court.

- 9 -

the PCRA on July 10, 2000, when the ninety–day period for her to file a petition for *writ of certiorari* with the Supreme Court of the United States expired, and that Appellant had until July 10, 2001 to file a timely PCRA petition.

On September 24, 2015, Appellant filed the present, counseled PCRA petition, which she titled her third PCRA petition. Simultaneously, she asked the court to appoint Craig B. Neely, Esquire, who had prepared the September 24, 2015 petition, as her counsel. The court granted Appellant's request for Mr. Neely to represent her at public expense.

Various claims were presented to the PCRA court as grounds for a new trial. Appellant argued that, the microscopic hair analysis comparison testimony offered at her 1998 trial was unreliable and would be inadmissible under current professional standards. Appellant also asserted that the Pennsylvania State Police deliberately, rather than accidentally, placed exemplar hairs taken from Appellant on the slides that were sent them to the FBI and Orchid for DNA testing and that the hairs on the slides were not the three seatback hairs. To summarize, she maintained that the Pennsylvania State Police conspired to convict her by substituting her exemplar hairs, and mounting those hairs on the slides sent to the FBI and later to Orchid instead of the three seatback hairs.

Appellant's PCRA petition established that the FBI received the three mounted hairs on the slides on July 12, 1995, which was consistent with the

trial testimony that the hairs mounted in the slides were sent to the FBI on July 11, 1995. Defendant's Third Petition for PCRA Relief, 9/24/15, at Exhibit 2, page 1 (an FBI report stating that three hairs mounted on slides were received from the Pennsylvania State Police on July 12, 1995). The record establishes that Appellant's exemplar hairs were not secured until November 9, 1995. N.T. Pretrial Hearings, 11/19/97, at 29-30. Thus, Appellant's conspiracy theory was discredited by the record as it was physically impossible for the Pennsylvania State Police to send Appellant's exemplar hairs to the FBI on July 11, 1995, when those hairs were not in the possession of the Pennsylvania State Police until November 9, 1995.

Appellant's third claim in her latest PCRA petition was that she recently discovered that Catasauqua Police Officer Joseph Kicska, who was one of the responders to Mr. Katrinak's home after Joann was reported missing, told Joseph York that he lied at trial when he said that an exterior door to the victim's home was pried open. Finally, Appellant averred in this latest PCRA petition that the Commonwealth withheld exculpatory evidence by failing to provide her with statements that Walter Traupman made to police. In the petition, Appellant relied upon the newly-discovered evidence exception to overcome the one-year time limitation for the filing of PCRA petitions.

The PCRA court dismissed the September 24, 2015 PCRA petition as untimely, and this appeal followed. Appellant raises these issues for our review:

A. Does Pennsylvania still recognize the `miscarriage of justice' standard adopted in **Commonwealth vs. Lawson**, 519 Pa. 504, 549 A.2d 107 (1988) as grounds for granting a serial PCRA petitioner a hearing?

B. Did Ms. Rorrer timely file a PCRA claim based on after discovered evidence, consisting of an FBI report indicating that, two years before DNA tests on hair roots the same hairs had "no roots attached," which she received on July 27, 2015 in response to a Freedom of Information Act request that she pursued, because she filed the claim within 60 days of receipt of the document, and because she could not have reasonably been expected to learn of the information therein prior to her receiving the document?

C. Should Ms. Rorrer be permitted to present the inadmissibility of the Commonwealth's microscopic hair comparison evidence at a hearing because her request to do so is not time-barred by **Commonwealth vs. Edmiston**, 619 Pa. 549, 65 A.3d 333 (Pa. 2013) since Edmiston is factually distinguishable or because a miscarriage of justice would occur if she would be prevented from doing so?

D. Did the trial court wrongfully conclude that the statements made in Joseph York's Affidavit would not be admissible at a PCRA Hearing because the statements made therein would be admissible under the Pennsylvania Rules of Evidence, specifically, Rules 803(25) and 804(3)?

E. Did the trial court wrongfully conclude that the "Walter Traupman Issue" was previously decided by Judge Ford in 2009, and therefore not capable of further pursuit, when Judge Ford's decision was based on his conclusion that the Commonwealth's **Brady** violation was not material because of DNA tests that matched Ms. Rorrer's, but the reliability of which are now in question as a result of the newly discovered FBI records confirming that the seatback hairs did not have roots on them when they were initially inspected by the FBI in June 1995?

Appellant's brief at 2-3.

This Court reviews the "denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." **Commonwealth v. Roane**, 142 A.3d 79, 86 (Pa.Super. 2016) (quoting **Commonwealth v. Treiber**, 121 A.3d 435, 444 (Pa. 2015)). It is now settled law that all PCRA petitions must be filed within one year of the date a defendant's judgment of sentence becomes final unless an exception to the one-year time restriction applies. 42 Pa.C.S. § 9545(b)(1). If a PCRA petition is untimely, "neither this Court nor the trial court has jurisdiction over the petition." **Commonwealth v. Miller**, 102 A.3d 988, 992 (Pa.Super. 2014) (citation omitted); **see also Commonwealth v. Chester**, 895 A.2d 520, 522 (Pa. 2006). We have previously held that Appellant's judgment of sentence became final on July 10, 2000, and that she had until July 11, 2001, to file a timely petition. The present petition, filed on September 24, 2015, is therefore facially untimely.

Appellant's first position is that the miscarriage-of-justice standard, under which second or subsequent post-conviction petitions were analyzed prior to the enactment of § 9545, is grounds for consideration of the merits of her serial untimely PCRA petition. In **Commonwealth v. Burton**, 936 A.2d 521, 527 (Pa. 2007), our Supreme Court specifically rejected the proposition that an allegation that a conviction is a miscarriage of justice obviates the need for the PCRA petitioner to establish that his or her PCRA petition is timely:

> [T]he courts of Pennsylvania will only entertain a "miscarriage of justice" claim when the initial timeliness requirement is met. ***See Commonwealth v. Fahy***, 558 Pa. 313, 330–331, 737 A.2d 214, 223 (1999), *cert. denied,* 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). Although the courts will review the request in a second or subsequent collateral attack on a conviction if there is a strong *prima facie* showing that a miscarriage of justice occurred, ***Commonwealth v. Morales***, 549 Pa. 400, 409–410, 701 A.2d 516, 520–521 (1997), there is no "miscarriage of justice" standard exception to the time requirements of the PCRA. ***Fahy***, 558 Pa. at 331, 737 A.2d at 223.

Hence, we reject Appellant's first issue.

Appellant's second averment on appeal is that she timely asserted her claim that there was a Commonwealth conspiracy against her and that the police sent the exemplar hairs taken from her on November 8, 1995, rather than three seatback hairs to the FBI for testing. In asserting her conspiracy claim, Appellant invokes the newly-discovered evidence exception outlined in § 9545(b)(1)(ii). "To qualify for an exception to the PCRA's time limitations under subsection 9545(b)(1)(ii), a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence." ***Commonwealth v. Burton***, 158 A.3d 618, 629 (Pa. 2017). "Due diligence does not require perfect vigilance and punctilious care, but merely a showing the party has put forth reasonable effort to obtain the information upon which a claim is based." ***Commonwealth v. Cox***, 146 A.3d 221, 230 (Pa. 2016) (citation and quotation marks omitted).

- 14 -

Appellant maintains that she did not discover the switch until she received FBI reports on July 27, 2015, which she requested pursuant to the "Freedom of Information Act." Appellant's brief at 12. However, the FBI reports attached by Appellant to her September 24, 2015 PCRA petition were prepared between 1995 and 1997. Appellant failed to establish why she could not have obtained them much sooner than she did through the "Freedom of Information Act." Appellant knew at her 1998 trial that the FBI had conducted DNA testing on the seatback hairs and her exemplar hairs. Thus, Appellant did not put forth reasonable efforts to obtain the FBI reports; she readily could have accessed them any time after she was charged in 1997, almost twenty years before she decided to do so. Her invocation of § 9543(b)(1)(ii) therefore fails. **Commonwealth v. Edmiston**, 65 A.3d 339 (Pa. 2013) (PCRA petitioner did not exercise due diligence in obtaining newly-discovered evidence because evidence was mentioned at trial); **see also Cox**, **supra**.

We also observe the following. Appellant represents to this Court that an FBI report attached to her PCRA petition establishes that there were no roots on any of the seatback hairs whereas the trial transcript indicates that some of the seatback hairs, *i.e.*, the ones mounted and sent to the FBI, had roots. Appellant's theory is that, since this FBI report that she cites purportedly established that none of the seatback hairs had roots, the exemplar hair, which did have roots, had to have been placed in the slides

instead of any seatback hairs.  Appellant specifically represents that an "FBI report unambiguously states that the seatback hairs had 'no roots attached.' R.R. 52." Appellant's brief at 12.

The record categorically belies Appellant's position.  The document on page fifty-two of the reproduced record is not part of **any** FBI report attached to Appellant's September 24, 2015 PCRA petition.  It is one page of a multi-page document, and page fifty-two of the reproduced record was Exhibit 4 to the PCRA petition at issue herein.  **See** PCRA Petition, 9/24/15, at Exhibit 4.  Meanwhile, Exhibit 4 has no connection to Exhibits 1, 2, and 3, which **were** the FBI reports.  Exhibit 4 has numbered paragraphs and starts with paragraph ten while the FBI reports do not have numbered paragraphs.  Exhibit 4 is merely one page from the middle of an unidentified document of unknown authorship.  Hence, Appellant's position that FBI reports established that no seatback hair had roots is unsubstantiated and incorrect.

In addition, Appellant has already litigated her claim that her exemplar hairs were switched for the seatback hairs.  As noted, after Orchid reported that all six seatback hairs belonged to Appellant and that the cigarette butt contained Appellant's DNA, Appellant immediately retracted her position that the chain of custody for the seatback hairs in the slides was unassailable.  At that time, she premised that switch on a mistake rather than a conspiracy.  The PCRA court thereafter specifically rejected counsel's assertion that one of Appellant's exemplar hairs "could mistakenly have been inserted as a hair

collected from the seatback." PCRA Court Opinion, 6/25/09, at 15. It concluded that the chain of custody for the three mounted seatback hairs was not infirm. *Id*.

Issues that have been finally litigated may not form the basis for granting PCRA relief. 42 Pa.C.S. § 9543(a)(3) (a petitioner is not eligible for relief under the PCRA unless he proves, *inter alia*, that the "allegation of error has not been previously litigated"). An issue is previously litigated if "it has been raised and decided in a proceeding collaterally attacking the conviction or sentence." 42 Pa.C.S. § 9544(a)(3). The "switching of hairs" issue now presented by Appellant has been previously litigated; it was raised and decided in a proceeding that collaterally attacked her conviction.

Appellant's third claim is that she timely asserted her position that the microscopic hair analysis utilized at her trial was infirm. In raising this allegation, Appellant relied upon an April 20, 2015 press release from the FBI indicating that microscopic hair analyses contained errors in ninety percent of cases. It is established, "Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2). Appellant did not present this claim until September 24, 2015, more than sixty days after the press release was issued. In *Edmiston*, *supra* at 352, our Supreme Court noted that there were various studies and reports published in the public domain "as early as 1974 and as recently as 2007" about the unreliability of

microscopic hair analysis, and it held that Edmiston did not timely assert that he was entitled to a new trial based upon the unreliability of such testing when he raised it in a 2005 PCRA petition. Appellant implicitly acknowledges that *Edmiston* controls the issue of the timeliness of this claim by asserting that its holding is "untenable." Appellant's brief at 17. We, however, are bound by *Edmiston*, and reject her position on its viability.

Appellant's fourth contention is that the PCRA court improperly concluded that York's affidavit did not warrant the grant of a new trial. York executed a document on December 12, 2015,[3] wherein he claimed the following. He was employed as a Northampton Borough police officer from 1990 to 2011, and Officer Kicska became a member of the Northampton Borough police force in 1999. In 1999, York and Officer Kicska were discussing this murder case when Officer Kiscka told York that Officer Kicska had perjured himself when he said at trial that an exterior door of the Katrinak residence was broken.

The Commonwealth responded to York's claim by presenting a declaration from Officer Kicska, which was executed pursuant to 18 Pa.C.S.

---

[3] The statement is not notarized, even though it is characterized as an affidavit. In it, Mr. York indicates that the averments were made "in recognition of the penalties set forth in 18 Pa.C.S.A. § 4904, relating to Unsworn Falsifications to Authorities." Affidavit of Joseph York, 12/21/15, at 2.

§ 4903,[4] and expressly made "under penalty of perjury." Declaration of Joseph Kicska, 3/30/16, at 1. Officer Kicska said that the assertions in the document from Mr. York were "patently incorrect and blatantly false." *Id*. at 2.

We conclude that York's statement does not constitute newly-discovered evidence. In it, Mr. York plainly stated:

---

[4] That statute provides:

> **(a) False swearing in official matters.**--A person who makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, when he does not believe the statement to be true is guilty of a misdemeanor of the second degree if:
>
> > (1) the falsification occurs in an official proceeding; or
> >
> > (2) the falsification is intended to mislead a public servant in performing his official function.
>
> **(b) Other false swearing**.--A person who makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, when he does not believe the statement to be true, is guilty of a misdemeanor of the third degree, if the statement is one which is required by law to be sworn or affirmed before a notary or other person authorized to administer oaths.
>
> **(c) Perjury provisions applicable.**--Section 4902(c) through (f) of this title (relating to perjury) applies to this section.

18 Pa.C.S. § 4903.

> I thought about this information for some time and found I was morally obligated to make this information known. **I contacted a person from the defense team and left a message briefly outlining the above conversation**. **Several months had gone by and I did not receive a response.** I next contacted the Crime Reporter for the Northampton Press Newspaper and made her aware of the above. She appeared interested at the time however I never heard from her again. **Believing there was nothing further I could do I reluctantly let the incident go**.

Affidavit of Joseph York, 12/21/15, at 1 (emphases added). York's affidavit plainly indicates that he spoke with Officer Kicska in 1999, thought about it, actually was in contact with a person from Appellant's then-existing defense team, and told them about the conversation that he had with Officer Kicska. Appellant's lawyers thus knew about York's statement long before 2015, and it was not "newly discovered." Instead, Appellant's allegation is properly characterized as one involving prior counsel's ineffectiveness in not investigating and presenting York's proof as the basis for a new trial when York told Appellant's defense team about Officer Kicska's alleged perjury. Allegations of ineffective assistance of counsel do not fall within an exception to the one-year time bar of the PCRA. *Edmiston*, *supra*; *Commonwealth v. Lesko,* 15 A.3d 345, 367 (Pa. 2011); *Commonwealth v. Crews,* 863 A.2d 498 (Pa. 2004).

We are aware that the PCRA court analyzed the York document in terms of whether it warranted the grant of a new trial on the basis of after-discovered evidence; however, we can affirm a trial court's decision on any

grounds. **Commonwealth v. O'Drain**, 829 A.2d 316, 322, n.7 (Pa.Super. 2003) ("We note that this court may affirm the decision of the trial court if there is any basis on the record to support the trial court's action; this is so even if we rely on a different basis in our decision to affirm.").

In addition, we express our complete agreement with the trial court that York's story does not warrant the grant of a new trial. In order to obtain a new trial based upon after-discovered evidence, the defendant must demonstrate, *inter alia*, that the evidence "would likely result in a different verdict if a new trial were granted." **Commonwealth. v. Foreman**, 55 A.3d 532, 537 (Pa.Super. 2012) (quoting **Commonwealth v. Pagan**, 950 A.2d 270, 292 (Pa. 2008)).

Officer Kicska denied the assertions that York made, and would testify at any new trial consistently with that denial. There were other officers who investigated the Katrinak residence and who would be able to verify Officer Kicska's report of the damaged door. In addition, nuclear DNA testing established that Appellant was the perpetrator of these murders as her hair was found in the victims' car on the day of their disappearance and her DNA was found on the cigarette butt recovered near the two bodies. Appellant's mother tried to hide a gun from police immediately after the bodies were found. Finally, Appellant confessed to the crime when she was arrested. Hence, we agree with the PCRA court that York's statement is not evidence that would likely result in a different verdict.

In her final claim raised on appeal, Appellant again seeks to gain a new trial due to the testimony of Mr. Traupman. She asserts that the 2006 finding that his testimony did not warrant a new trial was misguided as it was premised upon a finding that the Orchid DNA evidence established that Appellant was guilty. Appellant characterizes this finding as faulty in light of the fact that the Pennsylvania State Police deliberately framed her by mounting her exemplar hairs instead of the seatback hairs and sending her exemplar hairs to the FBI for testing. As analyzed above, Appellant's conspiracy theory involving the "switching of the hairs" is unfounded. Thus, we conclude that this last position raised on appeal has been finally litigated.

As the PCRA court's findings are supported by the record and free of legal error, we affirm the denial of PCRA relief.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2017